IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| Plaintiff, ) | Case No.: 7:11-PO-316 |
| ) | |
| v. ) | |
| ) | |
| THOMAS EDWARD KING ) | By: Hon. Robert S. Ballou |
| ) | United States Magistrate Judge |
| Defendant. ) | |

**MEMORANDUM OPINION**

Defendant, Thomas Edward King ("King"), is charged with operating a vehicle under the influence of alcohol in violation of 36 C.F.R. § 4.23(a)(1) and (2) [1], refusal to submit to a test to determine blood alcohol content in violation of 36 C.F.R. § 4.23(c)(2), driving without headlights in violation of 36 C.F.R. § 4.2, assimilating Virginia Code § 46.2-1030, and interference with a government employee engaged in an official duty in violation of 36 C.F.R. § 2.32(a)(1). A bench trial was held on April 4, 2012, after which the court took the matter under advisement.

The court has carefully considered the evidence adduced at trial and finds that the government met its burden of proving King guilty of driving without headlights, being under the influence of alcohol to a degree that rendered him incapable of safe operation of his vehicle, and refusing to submit to a breath test. For the reasons stated below, the court finds King **GUILTY** of violating 36 C.F.R. § 4.2, assimilating Virginia Code § 46.2-1030, 36 C.F.R. § 4.23(a)(1), and

---

[1] At trial the court granted the government's motion to dismiss the charge under 36 C.F.R. § 4.23(a)(2), driving while intoxicated with a blood alcohol concentration level of over .08 grams.

1

36 C.F.R. § 4.23(c)(2), and **NOT GUILTY** of violating 36 C.F.R. § 2.32(a)(1). A sentencing hearing will be set.

I.

The threshold issue is whether the investigating ranger instituted his traffic stop on federal or private lands, and thus, whether any wrongful conduct occurred on federal property. The trial testimony and evidence regarding the location of the boundary line for the Blue Ridge Parkway and exactly where the traffic stop occurred is set forth in detail. During the evening hours of September 10, 2011, Ranger James Lyon established a position located on national park property near the intersection of the Blue Ridge Parkway and Overlook Ridge Drive to patrol for deer poachers. Overlook Ridge Drive runs in a generally east/west direction and provides access to a private neighborhood west of the Blue Ridge Parkway. GIS markers identify the national park boundary line, which crosses Overlook Ridge Drive approximately 250 feet west of the Blue Ridge Parkway. Thus, Overlook Ridge Drive lies partially on private lands and partially on national park property.

Two wooden pillars located at or near the national park boundary line, one on either side of Overlook Ridge Drive post "No Trespassing" and" Stop" signs for vehicles heading from the Blue Ridge Parkway onto the private drive. The evidence is in conflict as to whether these pillars are located on national park lands or private property. The government's evidence established that Ranger Lyon has served as a park ranger for four years and is familiar with the location of the boundary line and the GIS markers locating that line. Ranger Lyon testified that the national park boundary line crosses Overlook Ridge Drive approximately two to three feet west of the pillars, such that the pillars are located on national park property. King's evidence, primarily

through his wife and photographs introduced into evidence, is that the boundary line crosses east of the pillars, and thus the pillars are located on private property.

Ranger Lyon testified that, on September 10, 2011, he parked his police vehicle on the private portion of Overlook Ridge Drive, in a grassy area a few feet before the national park boundary line. Ranger Lyon crossed onto national park property, and positioned himself along a bush line approximately 10-15 yards from the boundary line to watch for deer poachers on the Blue Ridge Parkway. Around 8:00 p.m., Ranger Lyon observed a slow-moving car with no headlights approaching the Blue Ridge Parkway from the private portion of Overlook Ridge Drive. Ranger Lyon observed the vehicle pass through the pillars and onto national park property, still without using headlights. After the vehicle traveled approximately 10-20 yards onto national park property without headlights, Ranger Lyon stepped from the bushes onto Overlook Ridge Drive and signaled the vehicle to stop.

Ranger Lyon approached the passenger side of the vehicle, and King's wife, Anita King, rolled down the window. Ranger Lyon asked the occupants of the vehicle why they were driving without headlights, and defendant King replied that they were enjoying the moonlight. Ranger Lyon then instructed King to pull his vehicle to a grassy area on the left side of the road. Ranger Lyon returned to his patrol car, and brought it to a position directly behind King's vehicle. Ranger Lyon testified that the initial traffic stop and all investigation occurred on national park property.

King's witnesses presented the following evidence. King drove a blue Toyota RAV vehicle east on Overlook Ridge Drive. King's wife, Anita was in the front passenger seat of the vehicle, and his daughter, Stephanie King Green, was in the rear seat. King intended to travel along Overlook Ridge Drive from the private neighborhood, turn south onto the Blue Ridge

3

Parkway, and travel approximately ¼ mile to his home just off the Parkway. King turned off his headlights while driving on the private portion of Overlook Ridge Drive, to enjoy the moonlight. King and his passengers saw Ranger Lyon's police vehicle parked on the left-hand side of Overlook Ridge Drive just before the national park boundary. King stopped his vehicle on the private portion of the road, approximately five feet before the pillars although no traffic signs directed that he do so. At that time, Ranger Lyon walked from his concealed position on the national park property onto Overlook Ridge Drive through the pillars, and approached the passenger side of King's vehicle. King claims that Ranger Lyon told him to turn on his headlights, pull through the pillars onto Blue Ridge Parkway property, and park in a grassy area to the left of the road. King complied. Ranger Lyon then returned to his vehicle and brought it to a position directly behind King's vehicle and on national park lands. King's evidence places the initial stop by Ranger Lyon on private property.

The evidence regarding the remainder of Ranger Lyon's investigation is not in dispute. Ranger Lyon smelled a strong odor of alcohol when he approached King's vehicle. Ranger Lyon observed that King's eyes were watery and bloodshot. Ranger Lyon asked King to step out of the vehicle to determine if the odor of alcohol was emitting from King's person or from his vehicle. King complied. Ranger Lyon smelled a strong odor of alcohol on King's breath, and asked King if he consumed any alcohol that evening. King replied that he had 3-4 beers while kayaking earlier in the day.

Ranger Lyon administered a series of field sobriety tests. The position of Ranger Lyon's vehicle allowed the video taping of a portion of the field sobriety tests. First Ranger Lyon administered the horizontal gaze nystagmus test. Ranger Lyon testified that six out of a total six possible clues were indicated. The test revealed a lack of smooth pursuit in both eyes,

4

nystagmus (rapid eye movement) at maximum deviation in both eyes, and nystagmus prior to 45 degrees in both eyes. Ranger Lyon testified that, based on his training and experience, this test confirmed that there was a probability that King had been consuming alcohol.

Ranger Lyon administered the walk-and-turn test, instructing King to take nine steps heel-to-toe, turn, and take nine steps heel-to-toe back, while keeping his arms at his side. The videotape showed that King lost his balance while Ranger Lyon gave the instructions. King also did not complete the turn correctly. The road was a hard-packed dirt surface with no lines. Ranger Lyon admitted that in training he was instructed to provide a straight line for the subject to walk, but did not draw such a line for King. Ranger Lyon instead used his flashlight to indicate the direction in which King should walk. King exhibited two of a possible eight clues of a person who has consumed alcohol.

King next performed the one-leg stand test. Ranger Lyon instructed King to stand on one foot and raise the other foot off of the ground for thirty seconds. Ranger Lyon testified that four out of four possible clues were indicated. King put his foot down on counts 20 and 23, raised his arm more than six inches from his body, swayed, and hopped on one leg to maintain balance. The videotape confirmed King's unsteady state during this test.

Following the administration of the field sobriety tests, Ranger Lyon requested that King submit to a portable breath test (PBT). The interaction while King attempted to take the PBT was not recorded. The testimony established that King agreed to take the PBT, and Ranger Lyon instructed him to take a deep breath in and blow out a steady stream of air into the portable breathalyzer unit until instructed to stop. Ranger Lyon administered the test twelve times before getting an acceptable sample. King was uncooperative in Ranger Lyon's attempts to administer the PBT. King clinched his teeth on the straw, put his tongue in the straw, blew air out of the

5

sides of his mouth, and hyperventilated before blowing into the machine. Ranger Lyon instructed King not to engage in those types of behaviors, and eventually captured a preliminary breath sample by using the override button on the machine. The PBT reading was positive, indicating that King had alcohol in his system. Ranger Lyon arrested King for driving under the influence at 8:45 p.m.

Anita King leaned out of the car window and yelled during the administration of the field sobriety tests and the PBT. Anita King implored her husband to cooperate with Ranger Lyon's attempts to administer the PBT. Eventually, Ranger Lyon requested Ranger Mark Faherty to report to the scene as a support officer. When Ranger Faherty arrived at the scene, King was sitting in the back of Ranger Lyon's patrol car. Rangers Faherty and Lyon explained to King that he would be taken to the Vinton Police Department to provide a breath sample into an Intox EC/IR II machine. King indicated an unwillingness to provide a breath sample. Ranger Faherty read King his rights under both the Virginia and Federal implied consent laws. Eventually, King consented to give a breath sample, and Ranger Lyon transported him to the Vinton Police Department followed by Ranger Faherty.

Ranger Faherty is a certified Intox EC/IR II machine administrator. Ranger Lyon is not a certified administrator, but was present during the administration of the Intox EC/IR II tests. Prior to administering a breath test, Ranger Faherty observed King during a mandatory twenty minute waiting period and explained to King how to properly blow into the machine. Ranger Faherty performed three breath tests on King using the Intox EC/IR II, each of which consisted of three separate blows into the machine. Ranger Faherty testified that although King appeared to be cooperative during the tests, all nine of his breath samples were less than 1500 ccs, the volume required by the machine for a valid test. Ranger Faherty testified that he encouraged

6

King throughout the tests, gave him instructions on how to blow into the machine, and physically demonstrated the proper technique by blowing into the air. Ranger Faherty also reminded King of the ramifications of failing to provide a breath sample under the implied consent law. Specifically, after the second round of testing, Ranger Faherty explained to King that if he did not provide a sufficient sample on the third breath test, he would be charged with refusal to provide a breath sample. King's breath samples on the third test were deficient, and Ranger Faherty charged him with refusal to submit to a test to determine blood alcohol content.

King's evidence attempted to establish the he could not provide a sufficient breath sample because he suffered from cracked ribs. All parties agree that on September 10, 2011, King did not inform Ranger Lyon or Faherty that he was unable to provide a breath sample due to a medical condition. Additionally, this condition did not prevent King from spending the day kayaking without any physical limitation.

## II.

The threshold issue in this case is whether King was operating his vehicle on federally owned lands administered by the National Park Service at the time he committed the offenses charged, as required by 36 C.F.R. § 1.2(a)(1). The government's evidence on this issue is the testimony of Ranger Lyon, which is contradicted by the testimony of King's witnesses.

Ranger Lyon testified that he has been a park ranger in this district for a year and a half, and was familiar with the national park boundary line and its relationship to Overlook Ridge Drive prior to September 10, 2011. Ranger Lyon knew the location of the boundary and carefully stayed on national park lands as he established his concealed position during the deer poaching patrol. Ranger Lyon testified that he did not leave this concealed area to step onto Overlook Ridge Drive to stop King's vehicle until after King crossed onto federal property. Ranger Lyon

7

testified that several days after King's arrest, he located the GIS markers on either side of Overlook Ridge Drive and walked the boundary line between those markers. Ranger Lyon testified that King's vehicle traveled on national park property for 10-20 yards before he revealed his presence to stop King.

King's witnesses testified that King initially stopped his vehicle five to six feet to the east of the wooden pillars, and did not travel on national park property until instructed to pull across the boundary line by Ranger Lyon. Anita King testified that the pillars are located on private land, and a vehicle must pass through them before entering national park property. Anita King did not know the location of the GIS markers prior to September 10, 2011. Her knowledge of the boundary line is based on statements made by King, neighbors, and people who live in the private estates off of Overlook Drive.

King testified by stipulation that he was on the private portion of the road during the initial encounter with Ranger Lyon. Within a few days of his arrest, King went back to the location of the stop, found the GIS markers on either side of Overlook Ridge Drive and walked the boundary line between the two markers. King concluded that his car was on the private portion of the road at the time of the stop. Stephanie King Green's stipulated testimony corroborated King's testimony.

This issue necessarily hinges on the credibility of Ranger Lyon versus King and his family members. The court must accept either the government or King's version of events; there is no overlap in their evidence. It is the duty of the fact finder to resolve discrepancies in the witness' testimony and to weigh the bias of each witness. *Banks v. Powell*, 917 F. Supp. 414, 418 (E.D.Va. 1996), *dismissed*, 101 F.3d 695 (4th Cir. 1996) (citing *U.S. v. Saunders*, 886 F.2d 56 (4th Cir. 1989)).

8

The court gives greater weight to the testimony of Ranger Lyon as to the location of King's vehicle at the time of the stop. Ranger Lyon is required to be aware of national park boundary lines for his duties as a National Park Service ranger. Ranger Lyon testified that he was familiar with the national park property boundary in this particular location prior to September 10, 2011, and often patrols the area several nights a week. Conversely, King and his family were not tasked with knowledge of the national park boundary line prior to September 10, 2011. At the time of the stop, they were traveling home after an afternoon of kayaking, during which they admittedly drank alcohol "on and off." It was after sunset and they were not using headlights.

Ranger Lyon's testimony as to the location of the stop is logical, credible and more persuasive than that of King and his witnesses. Consequently, the court finds that King traveled onto national park land before Ranger Lyon stopped the vehicle as required by 36 C.F.R. § 1.2(a)(1).[2]

### III.

King is charged with driving without headlights in violation of 36 C.F.R. § 4.2, assimilating Virginia Code § 46.2-1030, which states, "[e]very vehicle in operation on a highway in the Commonwealth shall display lighted headlights and illuminating devices as required by this article (i) from sunset to sunrise…" There is no issue that King was operating his vehicle without headlights after sunset. In fact, King's evidence is that he drove without headlights so that he could enjoy the moonlit evening. The court previously determined that

---

[2] A considerable amount of testimony at trial focused on whether the pillars on either side of Overlook Ridge Drive were located on private property or national park property. The court accepts Ranger Lyon's testimony that King's vehicle traveled 10-20 yards past the pillars onto national park property prior to the stop. Both parties agreed that the national park boundary line was, at most, a few feet to either the east or west of the pillars. Consequently, it is immaterial to the court's decision whether the pillars are located on private property or national park land.

9

King's operation occurred on National Park Service property. Thus, the court finds King **GUILTY** of violating Virginia Code § 46.2-1030, as assimilated by 36 C.F.R. § 4.2.

### IV.

King is charged with refusal to submit to a breath test for the purpose of determining blood alcohol content under 36 C.F.R. § 4.23(c). Section 4.23(c)(1) provides:

> At the request or direction of an authorized person who has probable cause to believe that an operator of a motor vehicle within a park area has violated a provision of paragraph (a) of this section, the operator shall submit to one or more tests of the blood, breath, saliva or urine for the purpose of determining blood alcohol and drug content.

36 C.F.R. § 4.23(c)(1). Section 4.23(c)(2) states that the refusal to submit to a test is "prohibited and proof of refusal may be admissible in any related judicial proceeding." 36 C.F.R. § 4.23(c)(2).

Rangers Lyon and Faherty had probable cause to believe that King violated a provision of 36 C.F.R. § 4.23(a), driving while intoxicated within a park area, based on Ranger Lyon's observations, King's performance on the field sobriety tests and the PBT results. Thus, King was required to submit to a breath test under 36 C.F.R. § 4.23(c)(1). The government and King agree that the Intox EC/IR II machine functioned properly and that Ranger Faherty correctly administered the breathalyzer test to King at the Vinton Police Department. King disputes that his failure to produce a valid breath sample constitutes "refusal" to submit to a breath test pursuant to 36 C.F.R. § 4.23(c)(2), and contends that his medical condition (broken ribs) caused his deficient test results.

Ranger Faherty administered three breath tests to King, each consisting of three blows into the Intox EC/IR II machine. Although King appeared to be cooperative while taking the tests, all nine of his breath samples were less than 1500 ccs, the volume required by the machine

10

for a valid test. At trial, King introduced as Exhibit 2 a Department of Forensic Science Subject Test Information, which shows the duration and volume of each breath sample provided by King. King's breath samples lasted anywhere from .52 second to 3.75 seconds, at volumes ranging from 288 ccs to 1315 ccs.

Melissa Kennedy, an employee of the Virginia Department of Forensic Science, testified at trial as an expert in toxicology and the operation and use of the Intox EC/IR II machine. Ms. Kennedy testified that the EC/IR II has a pressure sensor that detects the amount of breath going through the sampling system. The instrument will stop recording a sample if the breath volume is less than 1500 ccs, the subject stops blowing, the subject sucks air back in, or the blow volume drops by more than 15%. Ms. Kennedy testified that it is not difficult to produce a blow volume over 1500 ccs, and that one may reach that level by providing a short and forceful air sample, or a soft but longer air sample. The key is providing a steady breath. Ms. Kennedy demonstrated the relative ease required to provide a consistent breath for a valid sample.

King testified that he was unable to give a sufficient breath sample because he had cracked ribs. King produced no medical evidence of his injury, the limitations it caused or that it limited his ability to provide a valid breath sample on September 10, 2011. Anita King testified that during the afternoon of September 10, 2011, King kayaked down a river for over six hours, paddled his own kayak without physical difficulty, and assisted in loading and unloading the kayaks from the vehicle. Rangers Lyon and Faherty testified that King had no noticeable health issues during the stop and arrest and that at no time did King inform them that he suffered from any medical condition or health problem that would interfere with his ability to provide a breath sample.

Given the dearth of evidence regarding King's medical condition, there is no reasonable explanation for King's inability to provide a breath sample over 1500 ccs, aside from his purposeful failure to provide a breath test. This conclusion is bolstered by King's previously uncooperative behavior while Ranger Lyon administered the PBT and, most importantly, his inconsistent breath samples despite the clear direction given by Ranger Faherty on using the Intox EC/IR II machine. Consequently, the court finds that although King did not expressly refuse to submit to a breath test, the evidence establishes beyond a reasonable doubt that he evaded the test through his uncooperative behavior, and is **GUILTY** of refusal to submit to a breath test in violation of 36 C.F.R. § 4.23(c)(2).

## IV.

King is charged with operating a vehicle under the influence of alcohol to a degree that rendered him incapable of safe operation under 36 C.F.R. § 4.23(a)(1). To prove the elements of this offense, the government must show that King (1) was operating or was in actual physical control of a vehicle, (2) under the influence of alcohol, (3) to a degree of intoxication that rendered him incapable of safe operation. *U.S. v. Foster*, 7:11-PO-00100, 2011 WL 5403203, at *10 (W.D.Va. Nov. 4, 2011). Clearly King was operating his vehicle on the night in question. The question is whether the government met its burden of proving King did so while under the influence of alcohol to a degree of intoxication that rendered him incapable of safe operation.

"'Federal case law applying § 4.23(a)(1) is sparse.'" *Foster*, 2011 WL 5403203, at *11, *citing U.S. v. McFarland*, 369 F.Supp.2d 54, 57 (D.Me. 2005) *aff'd* 445 F.3d 20 (1st Cir. 2006). It is not necessary to prove defendant's blood alcohol content to obtain a conviction under 36 C.F.R. § 4.23(a)(1). The totality of the evidence can establish that a defendant was intoxicated to a degree that rendered him incapable of safe operation. *Foster*, 2011 WL 5403203, at *11, *U.S.*

12

*v. Coleman*, 750 F.Supp. 191, 196 (W.D.Va. 1990). This evidence can include the officer's observations in the field, and defendant's behavior, including erratic driving, slurred speech, bloodshot eyes, failure of field sobriety tests, and the smell of alcohol about the defendant's person. *United States v. Rauhof*, 1:06PO00057, 2006 WL 3455066 (W.D.Va. Nov. 29, 2006) *citing U.S. v. Eubanks,* 435 F.2d 1261, 1262 (4th Cir. 1971); *U.S. v. Farmer,* 820 F.Supp. 259, 266 (W.D.Va. 1993). The government argues that the totality of the circumstances proves King's guilt beyond a reasonable doubt. The court agrees.

There is no question that King was under the influence of alcohol to some degree at the time of the stop. King admitted to drinking 3-4 beers on September 10, 2011. Anita King testified that King drank "on and off" all afternoon, and drank a beer as late as 6:30-7:00 p.m. Ranger Lyon testified that King's breath smelled of alcohol, and his eyes were watery and bloodshot. King demonstrated the maximum clues of impairment on the horizontal gaze nystagmus test and one-leg stand test, and two clues of impairment on the walk and turn test. King had trouble maintaining his balance and following directions throughout the administration of the field sobriety tests. The videotape of King performing the field sobriety tests confirms his unsteady state. This evidence indicates that King was intoxicated to a degree that impaired his physical control.

King's operation of a vehicle without headlights after dark constitutes unsafe operation of a vehicle. Under Virginia law, it is illegal to operate a vehicle without headlights after sunset, regardless of whether there seems to be sufficient ambient light. *See* Va. Code Ann. § 46.2-1030 (West 2012). There are sound safety reasons for such a law, to both protect the occupants of the vehicle, to allow the vehicle to be visible to others, and to permit the driver to see potential dangers in the road.

13

King's operation of his vehicle without headlights also indicates a lack of judgment. This conclusion is supported by King's uncooperative behavior during the administration of the PBT. Finally, although there is no direct evidence of King's blood alcohol level, under 36 C.F.R. § 4.23(c)(2), the court may draw a negative inference from King's refusal to provide a breath sample. *See U.S. v. Van Hazel*, 468 F.Supp.2d 792, 798 (E.D.N.C. 2006)(defendant's refusal to take a breathalyzer test is substantive evidence that defendant was driving while impaired.) *See also* 18 U.S.C. § 3118 (permitting evidence of refusal in criminal prosecution for driving under the influence). The reasonable inference from King's refusal to provide a breath sample is that King believed that his BAC was over the legal limit.

This district has upheld impaired driving convictions under similar circumstances. In *United States v. Coleman*, 750 F.Supp. 191 (W.D.Va. 1990), the court affirmed defendant's guilty conviction under 36 C.F.R. § 4.23(a)(1) based upon evidence that defendant had several beer cans surrounding his vehicle, smelled of alcohol, had difficulty focusing and slurred speech, failed some of the field sobriety tests, and had a BAC of .09 grams. Similarly, in *United States v. Jones*, 403 F.Supp.2d 518 (W.D.Va. 2005), *aff'd* 428 F.Supp.2d 497 (W.D.Va. 2006), the court found defendant guilty under 36 C.F.R. § 4.23(a)[3] where defendant drove at a rapid rate of speed, wove in and out of traffic, had a strong odor of alcohol, failed some of the field sobriety tests, admitted drinking, and a breath test showed a BAC of .083 grams.

The facts in this case are particularly analogous to those in *United States v. Matzke*, C-09-1037, 2010 WL 1257810 (S.D. Tex. Mar. 26, 2010), where the court found defendant guilty of violating 36 C.F.R. § 4.23(a)(1) based on evidence that the defendant admitted to consuming three drinks, smelled of alcohol, could not maintain balance or follow directions during the field

---

[3] No subsection of § 4.23(a) was specifically identified.

sobriety tests, drove outside of his lane of travel, and refused to give a blood test to determine blood alcohol content. *Matzke*, 2010 WL 1257810 at *2.

The court is mindful that in *United States v. Foster*, the district court found a defendant not guilty of violating 36 C.F.R. § 4.23(a)(1) based on facts similar to those in this case. 7:11-PO-100, 2011 WL 5403203 (W.D.Va. Nov. 4, 2011). Like King, the defendant in *Foster* admitted to drinking, had watery, bloodshot eyes, smelled of alcohol, and failed some of the field sobriety tests. However, the court in *Foster* found no evidence that defendant exhibited balance issues or impaired judgment. *Foster*, 2011 WL 5403203, at *16. Moreover, the defendant in *Foster* was cooperative and provided a breathalyzer sample. *Foster*, 2011 WL 5403203, at *3. The court in *Foster* admitted that it was a "close case," but ultimately found a lack of evidence demonstrating that the defendant was incapable of the safe operation of his vehicle. *Foster*, 2011 WL 5403203, at *16. In this case, the negative inference of refusing to submit to a breath test is coupled with King's demonstrated impaired physical control and his impaired mental judgment by choosing to operate his vehicle after dusk without headlights. Considering the totality of the evidence, this court finds King **GUILTY** of intoxication to a degree that rendered him incapable of safe operation of his vehicle in violation of 36 C.F.R. § 4.23(a)(1).

## V.

King is charged with intentionally interfering with a government employee or agent engaged in an official duty under 36 C.F.R. § 2.32(a)(1). A defendant interferes with a government agent if he opposes, intervenes, hinders or prevents the agent from carrying out his or her official duties. *U.S. v. Hall*, 343 F. App'x 883, 884 (4th Cir. 2009) citing *U.S. v. Bucher*, 375 F.3d 929, 932 (9th Cir. 2004). In *Hall*, the court affirmed the defendant's conviction for interference under 36 C.F.R. § 2.32(a)(1) because he refused to answer an officer's questions

15

about the defendant's identity. 343 F. App'x at 884. The court found that the defendant prevented the officer from carrying out his duties, i.e. taking routine booking information from arrested persons to confirm their identity. *Id. See also United States v. Karoly*, 1991 WL 7718 (4th Cir. 1991)(affirming conviction for intentional interference under 36 C.F.R. § 2.32(a)(1) where defendant ripped badge from officer's shirt and punched officer in the shoulder.)

The evidence in this case does not rise to a level sufficient to find King guilty of intentional interference under 36 C.F.R. § 2.32(a)(1). Although King had moments of uncooperative behavior, he did not prevent Rangers Lyon or Faherty from performing their official duties. Ranger Lyon was able to obtain a PBT sample from King by using the override button on the machine. Likewise, Ranger Faherty was able to administer the breathalyzer tests; he simply did not obtain a sample over 1500 ccs. On the whole, King followed directions and had a peaceful exchange with the rangers. The court finds that King's actions do not meet the standard for intentional interference contemplated by 36 C.F.R. § 2.32(a)(1).

## VI.

As set forth above, the court finds King **GUILTY** of violating 36 C.F.R. § 4.2, assimilating Virginia Code § 46.2-1030, 36 C.F.R. § 4.23(a)(1), and 36 C.F.R. § 4.23(c)(2), and **NOT GUILTY** of violating 36 C.F.R. § 2.32(a)(1). The Clerk is directed to serve a copy of this opinion to all counsel of record and schedule a sentencing hearing.

Entered: May 11, 2012

*/s/ Robert S. Ballou*
Robert S. Ballou
United States Magistrate Judge